FILED
2021 Dec-27  PM 12:35
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ALABAMA
# MIDDLE DIVISION

GARY W. FORD,                    )
                                 )
    Plaintiff,               )
                                 )
v.                               )    Case No. 4:20-cv-00778-NAD
                                 )
LOUIS DEJOY,                     )
                                 )
    Defendant.               )

## MEMORANDUM OPINION AND ORDER DENYING
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

For the reasons stated below and on the record in the October 28, 2021 motion hearing, the court **DENIES** Defendant Louis DeJoy's motion for summary judgment (Doc. 25).

## INTRODUCTION

Plaintiff Gary W. Ford, a United States Postal Service ("USPS") employee at all relevant times, filed a complaint against the Postmaster General,[1] alleging discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. Doc. 1. Plaintiff Ford, a male employee, alleged that USPS discriminated against him based on sex; according to Ford, USPS improperly reassigned his job

---

[1] At the time that Ford filed his complaint, the Postmaster General was Megan Brennan. Doc. 1. Now, current Postmaster Louis DeJoy is substituted as Defendant. *See* Doc. 13 at 1 n.1.

duties, which denied him access to overtime pay, and which benefitted similarly situated female employees.   Doc. 1.   On Defendant Postmaster DeJoy's summary judgment motion (Doc. 25), the court concludes—with respect to *liability*—that there are genuine disputes of material fact for trial.

## BACKGROUND

### A.    Factual background

#### 1.    Plaintiff Ford's employment history at the USPS "Gadsden cluster," and his 2015 principal assignment to the Glencoe Post Office

USPS operates a cluster of post offices around Gadsden, Alabama, known as the "Gadsden cluster."   The Gadsden cluster includes the Gadsden Post Office (the "main office"), the East Gadsden Post Office, the Glencoe Post Office, and the Alabama City Post Office.   Doc. 24-1 at 14–16; Doc. 24-2.

Plaintiff Ford began working for USPS in the Gadsden cluster in 1981, and continued to work there until he retired in 2021.   Doc. 24-1 at 4.

From 2015 until his retirement in 2021, Ford was a "lead sales service associate" ("LSSA") in the Gadsden cluster at pay level 7—the highest pay grade for an LSSA.   Doc. 24-1 at 4–5.

In 2017 (the relevant time period for this lawsuit), Ford was the third most senior USPS "clerk" employee in the Gadsden cluster.   Doc. 28-1.

In 2015, Ford successfully bid—based on his seniority—on a posting for a

principal assignment to the Glencoe Post Office.   Doc. 24-1 at 7, 22.   The Glencoe

Post Office was a "desirable assignment," where Ford was the only employee, and

where there was no supervisor present.   Doc. 24-1 at 7; Doc. 24-6 at 2.

The parameters of the principal assignment to the Glencoe Post Office were

as follows[2]:   Each workday, an LSSA would be required to report first to the

Gadsden Post Office main office, then go to the Glencoe Post Office for most of the

shift, and then finish the day at the East Gadsden Post Office.   Doc. 24-10.

So, on a typical workday, Ford would report to the Gadsden Post Office to

start his shift, then drive his personal vehicle to the Glencoe Post Office around 7:30

AM, then drive his vehicle to the East Gadsden Post Office to finish his shift.   Doc.

24-1 at 7–8.   USPS paid Ford for the time that he spent driving between the different

branches, and Ford received approximately $6 per day in mileage reimbursement.

Doc. 24-1 at 9–10.

No other LSSAs at pay level 7 in the Gadsden cluster regularly travelled

between branches.   Doc. 24-1 at 10.

Ford typically worked a regular 40 hour per week schedule, with assigned

weekday shifts from 5:00 AM to 1:30 PM.   Doc. 24-1 at 5.

---

[2] That principal assignment to the Glencoe Post Office was established by a class
action grievance settlement under the applicable USPS collective bargaining
agreement.   Doc. 24-1 at 9, 18–20; Doc. 24-10.   The record does not clearly show
the circumstances that led to the grievance settlement.   Doc. 24-10.

USPS clerks like Ford are not specifically entitled to work overtime.   Doc. 24-3 at 15.   But, pursuant to a "verbal management instruction," Ford typically worked two hours of overtime at the Gadsden Post Office each morning before his regular shift began at 5:00 AM.   Doc. 24-1 at 5–6.   Also, Ford typically worked overtime on Saturdays.   Doc. 24-1 at 5–6.   He usually accrued approximately 18 hours of overtime per week.   Doc. 24-1 at 5–6.

### 2. The 2017 USPS "Function 4" analysis, and the September 2017 "abolishment" of clerk positions in the Gadsden cluster

In 2017, USPS conducted a "Function 4" analysis of the Gadsden cluster, during which a team monitored the cluster's workload to assess how many clerks were needed for adequate staffing and service.   Doc. 24-5 at 3–4.   The Function 4 analysis did not focus on specific clerks, but instead on the cluster's overall operation and the number of clerk positions.   Doc. 24-5 at 9, 14.

According to Kenneth Powchak (the Postmaster at the Gadsden cluster at the time), the Function 4 analysis showed that the Gadsden cluster was overstaffed. Doc. 24-3 at 3, 10; Doc. 24-6 at 2.

However, in discovery in this case, Powchak testified that at the time of the Function 4 analysis he was not aware of an excess of Level 7 clerks like Ford.   Doc. 24-3 at 4.   Powchak stated that he thought that the Function 4 analysis showed overstaffing among the Level 6 clerks.   Doc. 24-3 at 5.

After the Function 4 analysis showed overstaffing, Powchak, Billie Jo

4

Dellinger (a female supervisor in the Gadsden cluster), and several other USPS employees were involved in discussions about reorganizing the clerk positions in the Gadsden cluster.   Doc. 24-6 at 2.

During the relevant time period, Dellinger supervised the clerks in the Gadsden cluster, including Ford.   Doc. 24-4 at 3; 24-1 at 16.   Dellinger also oversaw overtime.   Doc. 24-3 at 4.

Powchak asked Dellinger to provide input into how USPS should reassign the clerk positions to address the overstaffing.   Doc. 24-3 at 12; Doc. 24-4 at 7–8.

Dellinger testified in her deposition that she suggested reassigning Ford to the East Gadsden Post Office because there were staffing needs in the morning at that office, and because the East Gadsden Post Office was closer to the Glencoe Post Office than the Gadsden Post Office was.   Doc. 24-4 at 8.   Dellinger testified that she stated at the time that reassigning Ford to the East Gadsden Post Office (from the Gadsden Post Office) would be more efficient; she also testified that reassigning Ford would result in Ford's spending "less time not physically working and being in the office."   Doc. 24-4 at 8, 10.

In discovery in this case, Dellinger could not remember suggesting that USPS reassign any clerk other than Ford to a different branch.   Doc. 24-4 at 8.

In September 2017, based on the Function 4 analysis and subsequent discussions, USPS instituted an "abolishment" of clerk positions in the Gadsden

cluster.   Doc. 24-1 at 6, 9; Doc. 24-7; Doc. 24-8.   Ford and the other clerks in the Gadsden cluster received notice that USPS was abolishing their positions, and that they would become "unassigned regular" employees.   Doc. 24-7; Doc. 24-8.

In March 2018 (and as explained below), the abolishment period ended, and USPS reinstated Ford's principal assignment to the Glencoe Post Office.   Doc. 24-1 at 9.

### 3. Plaintiff Ford's reassignment during the six-month abolishment period

Ford's abolishment notification letter stated that his work schedule would be from 5:00 AM to 2:00 PM with Saturdays and Sundays off.   Doc. 24-7.   The letter also stated that he would begin each day by reporting to the East Gadsden Post Office (and not the Gadsden Post Office main office), before then continuing his day at the Glencoe Post Office, and then finishing his day back at the East Gadsden Post Office. Doc. 24-7.

Because that reassignment during the abolishment period required Ford to report first to the East Gadsden Post Office (instead of the Gadsden Post Office main office), the reassignment violated the grievance settlement that had established the principal assignment to the Glencoe Post Office.   Doc. 24-1 at 11; Doc. 24-10; *see supra* Part A.1.

On April 20, 2019, as part of discovery, Powchak provided a sworn declaration about the abolishment and Ford's reassignment.   Doc. 24-6.   Powchak

stated that USPS selected Ford for reassignment because Ford travelled between multiple offices each day.   Doc. 24-6 at 3–4.   Powchak stated that Ford's reassignment to the East Gadsden Post Office made sense because (1) USPS could avoid staffing an additional full-time employee at the East Gadsden Post Office, (2) the East Gadsden Post Office was closer to the Glencoe Post Office than the Gadsden Post Office was, and (3) Ford's reassignment would save on mileage costs and reimbursement.   Doc. 24-6 at 3–4.

### 4.   USPS did not reassign any female clerks in the Gadsden cluster during the six-month abolishment period

No female clerks in the Gadsden cluster were reassigned to a different reporting location during the abolishment period.   Doc. 24-4 at 15.

In fact, the only employee other than Ford whom USPS reassigned to a different reporting location during the abolishment period was another male employee, Gary Priest.   Doc. 24-1 at 12; Doc. 24-4 at 16; Doc. 24-8.

Before the abolishment, Priest had been working at the East Gadsden Post Office; according to Ford, Priest had been working full-time at that office.   Doc. 24-1 at 13–14.   USPS reassigned Priest to the Gadsden Post Office main office.   Doc. 24-1 at 12.

In discovery, Powchak stated that, before the abolishment, Priest had worked only for a few hours per day at the East Gadsden Post Office.   Doc. 24-6 at 4.   Powchak stated that USPS reassigned Priest to the Gadsden Post Office main office

because Priest could work a daily full eight-hour shift at that office.   Doc. 24-6 at 4.

### 5.   The abolishment period ended in March 2018 because USPS had not posted the clerk positions for bidding, as the collective bargaining agreement required

Pursuant to the applicable USPS collective bargaining agreement, USPS was required—within a certain amount of time after the abolishment—to post clerk positions so that employees could bid on them.   Doc. 24-1 at 21; Doc. 24-12 at 15–18; Doc. 28-2 at 138–167.   Instead, USPS improperly reassigned clerk employees, including Ford, without following that job-posting requirement.   Doc. 24-12 at 17–19; Doc. 24-3 at 4–5, 8.

During the abolishment period, female clerks remained assigned to positions at the Gadsden Post Office main office.   Doc. 24-1 at 13, 27–28; Doc. 24-4 at 15.

But, if USPS properly had posted for bidding the positions at the Gadsden Post Office main office (for which female clerks were assigned during the abolishment period), then Ford could have bid on those positions; Ford then would have been able to earn overtime at that office.   Doc. 28-4 at 2.   Ford could have earned his same salary even in a lower level position at the Gadsden Post Office main office.   Doc. 28-4 at 2.

Powchak testified in his deposition that, given Ford's seniority, Ford "probably would have gotten any job posted that he wanted."   Doc. 24-3 at 15.

Powchak stated that, if USPS had posted those positions, Ford could have bid for any position at the Gadsden Post Office main office, and would have received that assignment in lieu of a female clerk with less seniority.   Doc. 24-3 at 15.

Dellinger testified in her deposition that she was aware that USPS was required to post the positions, but that she never talked to anyone about posting the positions because that was the postmaster's job and not hers.   Doc. 24-4 at 17.   She stated that, because USPS had not posted the positions, there was no way for Ford to bid on or obtain a position at the Gadsden Post Office main office.   Doc. 24-4 at 17.

Ultimately, because USPS failed to follow the procedures required under the collective bargaining agreement, USPS paid a $143,000 class action grievance settlement.   Doc. 24-12 at 15–16.

Ford received compensation in that settlement, but the settlement applied to all clerks whose assignments and/or schedules USPS improperly had changed during the abolishment period.   Doc. 24-12 at 15–16.   Ford did not file an individual grievance related to the abolishment and his reassignment.   Doc. 24-1 at 34; Doc. 24-13.

The abolishment period ended on March 17, 2018, and Ford reverted to his previous assignment—the principal assignment to the Glencoe Post Office.   Doc. 24-1 at 9; Doc. 24-9 at 1; *see supra* Part A.1.

Ford retired in 2021.   Doc. 24-1 at 4.

> **6.    Plaintiff Ford's ability to earn overtime pay during the six-month abolishment period**

During the six-month abolishment period, Ford daily reported first to the East Gadsden Post Office, instead of the Gadsden Post Office main office.   Doc. 24-1 at 11.   At the East Gadsden Post Office, Ford was not eligible to work his usual (*pre-abolishment*) morning overtime.   Doc. 24-1 at 11.   During the abolishment period, Ford would arrive at the East Gadsden Post Office at 5:00 AM, drive to the Glencoe Post Office around 7:40 AM, and then drive back to the East Gadsden Post Office around 12:40 PM to finish his day.   Doc. 24-1 at 13–14.

Ford testified in his deposition that he was not eligible to work any overtime during the abolishment period; Ford said that he could not include his name on the "overtime desired list"—on which clerk employees, in certain situations, could sign-up to obtain voluntary overtime.   Doc. 24-1 at 6–7.

Ford also testified that there was no overtime work available at the East Gadsden Post Office.   Doc. 24-1 at 11.   Dellinger, however, testified in her deposition that afternoon overtime was available at the East Gadsden Post Office during the abolishment period.   Doc. 24-4 at 10–11.   And, according to Dellinger, she asked Ford to work afternoon overtime on a few occasions, but Ford refused.   Doc. 24-4 at 16.

Most of the overtime work in the Gadsden cluster was available at the

Gadsden Post Office main office.   Doc. 24-3 at 14.

During the abolishment period, Ford could not work overtime at the Gadsden Post Office main office.   Doc. 24-1 at 28–29; Doc. 24-3 at 14, Doc. 24-4 at 11.

But the female clerks assigned to the Gadsden Post Office main office continued to have access to overtime work during the abolishment period.   Doc. 24-1 at 28–29.   And Priest—the male clerk employee whom USPS reassigned from the East Gadsden Post Office to the Gadsden Post Office main office during the abolishment period—did not work overtime during the abolishment period.   Doc. 24-1 at 12; Doc. 24-4 at 16.

USPS equalized overtime work among the clerks; so, if a clerk had worked less overtime than other clerks, then USPS would offer that clerk more overtime work.   Doc. 24-4 at 5–7.   Dellinger testified that "nobody" ever had contacted her to request more overtime—not Ford, no other male clerk, and no female clerk.   Doc. 24-4 at 7, 9.   She also stated that no female clerk ever had complained to her about Ford's working more overtime than they did.   Doc. 24-4 at 9.

Ford did not work at the Gadsden Post Office main office or earn his typical overtime pay until after the six-month abolishment period had ended.   Doc. 24-1 at 31; Doc. 24-4 at 3.

### B.    Procedural background

Ford timely filed an EEOC discrimination charge based on his reassignment

during the abolishment period.   Doc. 1 at 3.   The EEOC entered judgment in favor of USPS, and Ford timely filed suit in this court.   Doc. 1 at 4–5.

After Ford filed his complaint (Doc. 1), the parties consented to magistrate jurisdiction pursuant to 28 U.S.C. § 636(c).   Doc. 9.   And, after the close of discovery, Defendant Postmaster DeJoy filed this summary judgment motion.   Doc. 25.   The motion has been fully briefed (Doc. 32; Doc. 37), including a round of supplemental briefing (Doc. 41; Doc. 42),[3] and the court held a motion hearing on October 28, 2021 (*see* Minute Entry, Entered: 10/28/2021).

### C.   Legal background

Title VII includes different governing provisions for private and federal employers.   *Tonkyro v. Secretary, Dep't of Veterans Affairs*, 995 F.3d 828, 833 (11th Cir. 2021).   For federal employers, including USPS, Title VII requires that "all personnel actions affecting employees . . . shall be made free from any discrimination based on race, color, religion, sex, or national origin."   42 U.S.C. § 2000e-16(a).   Personnel actions in the federal employment context "include most employment-related decisions, such as appointment, promotion, work assignment, compensation, and performance reviews."   *Babb v. Wilkie*, 140 S. Ct. 1168, 1172–73 (2020) (citing 5 U.S.C. § 2302(a)(2)(A)).

Until recently, to prevail on a discrimination claim under § 2000e-16(a), a

---

[3] This case was reassigned to the undersigned on August 30, 2021.   Doc. 38.

plaintiff had to show that his protected status "was the but-for cause of the adverse employment action" at issue. *Durr v. Secretary, Dep't of Veterans Affairs*, 843 F. App'x 246, 247 (11th Cir. 2021). When assessing a discrimination claim based only on circumstantial evidence, a court would either apply the burden-shifting framework from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), or assess whether the plaintiff had presented a "convincing mosaic of circumstantial evidence" that supported an inference of discrimination. *Id*. (quoting *Lewis v. City of Union City*, 934 F.3d 1169, 1185 (11th Cir. 2019)).

But the United States Supreme Court's recent ruling in *Babb v. Wilkie* changed the law for discrimination claims filed by federal employees. 140 S. Ct. 1168. The U.S. Supreme Court held, in the context of a federal employee's discrimination claim under the Age Discrimination in Employment Act ("ADEA"), that "age need not be a but-for cause of an employment decision" for a plaintiff to prove discrimination. *Id*. at 1172. Instead, age must be "the but-for cause of *differential treatment*," not the but-for cause of an ultimate employment decision. *Id*. at 1174 (emphasis in original). As a result, at least with respect to *liability*, a federal employee alleging discrimination under the ADEA need only show that age discrimination played "any part" in the way that the federal employer made a personnel decision. *Id*.

The Supreme Court made clear, however, that to obtain full *relief*—as

differentiated from the proof required to establish liability—more was required. *Babb*, 140 S. Ct. at 1171. To obtain full relief, including "hiring, reinstatement, backpay, and compensatory damages," a plaintiff still must show that discrimination was the "but-for cause of the challenged employment decision." *Babb*, 140 S. Ct. at 1171. Consequently, to obtain all forms of relief, a plaintiff must show that "a personnel action would have been different if [a protected characteristic] had not been taken into account." *Id.* Where a plaintiff only can show that discrimination was the but-for cause of differential treatment, but not the but-for cause of an employment decision, the plaintiff may be entitled to "injunctive or other forward-looking relief." *Id.* at 1178.

After announcing that new standard, the U.S. Supreme Court remanded the *Babb* case to the Eleventh Circuit for further proceedings. *Id.* at 1178. On remand, the Eleventh Circuit held that the statutory language from the ADEA, which the Supreme Court had analyzed in *Babb*, is "materially identical" to the Title VII language in § 2000e-16(a). *Babb v. Secretary, Dep't of Veterans Affairs*, 992 F.3d 1193, 1198 (11th Cir. 2021) ("*Babb II*").[4] The Eleventh Circuit held that the Supreme Court's *Babb* rule applies not only to federal employees' claims under the

---

[4] *See* 29 U.S.C. § 633a (requiring that all personnel actions for federal employees be "free from any discrimination based on age" under the ADEA); 42 U.S.C. § 2000e-16(a) (requiring that all personnel actions for federal employees be "free from any discrimination" based on race, color, religion, sex, or national origin under Title VII).

ADEA, but also to federal employees' discrimination claims under Title VII.  *Id.*

Consequently, under § 2000e-16(a), a federal employer must make a personnel decision "in 'a way that is not tainted by differential treatment based on' a protected characteristic."  *Id.* at 1199–1200 (quoting *Babb*, 140 S. Ct. at 1174). A personnel decision is tainted by discrimination if a protected characteristic plays "any part" in the way that the federal employer made that decision.  *Id.* at 1204 (quoting *Babb*, 140 S. Ct. at 1174).  Thus, a federal employer is liable for discrimination under Title VII if a protected characteristic was "the but-for cause of *differential treatment*," regardless whether the protected characteristic was the but-for cause of the ultimate employment decision.  *Id.* (quoting *Babb*, 140 S. Ct. at 1174).  "[E]ven when there are non-pretextual reasons for an adverse employment decision," the "presence of those reasons doesn't cancel out the presence, and the taint, of discriminatory considerations."  *Id.* at 1204.

Because discrimination need not be the but-for cause of an adverse employment action under the new rule, the Eleventh Circuit now has held in multiple unpublished decisions that the *McDonnell Douglas* burden-shifting framework and the "convincing mosaic" test no longer apply to determinations of *liability* on Title VII discrimination claims filed by federal employees.[5]  The Eleventh Circuit has

---

[5] *E.g.*, *Durr*, 843 F. App'x at 247; *see also Malone v. United States Attorney General*, No. 20-12527, 2021 U.S. App. LEXIS 15661, at *12 (11th Cir. May 26, 2021) (holding that, after *Babb*, the *McDonnell Douglas* framework does not apply

explained that those frameworks no longer apply in determining liability because they both "are methods of showing that the protected characteristic was the but-for cause of the ultimate decision." *Durr*, 843 F. App'x at 247. However, those frameworks still do apply in determining the availability of *relief*, because relief based on the end result of an employment decision still does require a showing of but-for causation as to that employment decision. *Babb*, 140 S. Ct. at 1177–78.

## LEGAL STANDARD

Summary judgment is appropriate when the movant establishes that "there is no genuine dispute as to any material fact," and that the movant "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A material fact is one that might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And a dispute about a material fact is "genuine," if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

To avoid summary judgment, the nonmovant must go beyond mere allegations to offer specific facts creating a genuine dispute for trial. *Celotex*, 477 U.S. at 324–25. The court's responsibility is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. The court must construe all evidence and

---

to liability determinations on discrimination claims under § 2000e-16(a)).

draw all reasonable inferences in the light most favorable to the nonmovant. *Centurion Air Cargo, Inc. v. UPS Co.*, 420 F.3d 1146, 1149 (11th Cir. 2005).

Where there is no genuine dispute of material fact for trial, the movant is entitled to judgment as a matter of law.   Fed. R. Civ. P. 56(a), (c).

## DISCUSSION

Plaintiff Ford worked for USPS (a federal employer), so the controlling statute required any personnel action to be free from discrimination.   *See* 42 U.S.C. § 2000e-16(a).   In the September 2017 abolishment, USPS reassigned Ford's position, which qualifies as a personnel action under the statute.   *See Babb*, 140 S. Ct. at 1172–73 (stating that employment decisions affecting work assignments qualify as personnel actions that must be free from discrimination).   Therefore, the issue on this summary judgment motion—at least with respect to *liability*—is whether there is a genuine dispute of material fact on the question whether Ford's reassignment during the abolishment period was free from discrimination based on sex.   *See* Fed. R. Civ. P. 56(a); 42 U.S.C. § 2000e-16(a).

I.   **The record contains no direct evidence that USPS discriminated against Plaintiff Ford based on sex, so Ford must rely on circumstantial evidence of discrimination.**

Because the record contains no direct evidence of discrimination based on Plaintiff Ford's sex, he must rely on circumstantial evidence of discrimination to show a triable issue of fact.   In the summary judgment motion, Defendant

Postmaster DeJoy argues that Ford has no direct evidence of discrimination.   Doc. 25 at 19–20.   Direct evidence of discrimination requires evidence that proves a fact at issue without inference or presumption.   *Rojas v. Florida*, 285 F.3d 1339, 1342 (11th Cir. 2002).

In this regard, Postmaster DeJoy is correct.   The record contains no direct evidence of discrimination based on Ford's sex, and Ford concedes that he relies only on circumstantial evidence.   Doc. 32 at 14.   Thus, the question is whether the record, when construed in Ford's favor, contains sufficient circumstantial evidence for a jury to reasonably infer that discrimination against Ford in violation of § 2000e-16(a) "play[ed] any part in" USPS's decision to reassign Ford during the abolishment period.   *See Babb*, 140 S. Ct. at 1174.

**II.   With respect to *liability*, and in light of the record circumstantial evidence, there is a triable issue of fact on the question whether discrimination played "any part" in USPS's decision to reassign Plaintiff Ford during the abolishment period.**

With respect to *liability*, and based on the circumstantial evidence in the record, there is a triable issue of fact on the question whether discrimination played "any part" in Plaintiff Ford's reassignment during the six-month abolishment period. *See Babb*, 140 S. Ct. at 1174.    That conclusion is based primarily on the part that Dellinger played in USPS's decision to reassign Ford.

### A. A jury reasonably could infer that sex discrimination was part of Dellinger's suggestion to reassign Plaintiff Ford, which was part of USPS's decision to reassign Ford during the abolishment period.

As explained above, the record shows that Dellinger—a female supervisor—had input into the clerk reassignments during the abolishment period, after the Function 4 analysis had shown that the Gadsden cluster was overstaffed. Doc. 24-6 at 2; Doc. 24-3 at 12; Doc. 24-4 at 3. Indeed, Dellinger was the first person to suggest that USPS should reassign Ford to the East Gadsden Post Office. Doc. 24-4 at 3, 12–13; Doc. 24-3 at 12–13; 24-1 at 16. USPS then reassigned Ford to the East Gadsden Post Office (Doc. 24-1 at 11), as Dellinger had suggested. So, at a minimum, Dellinger's input and her suggestion that USPS reassign Ford to the East Gadsden Post Office were part of USPS's decision to reassign Ford.

The record also indicates that the Function 4 analysis showed overstaffing among the Level 6 clerks, not the Level 7 clerks (like Ford). Doc. 24-3 at 5. Nevertheless, Dellinger suggested reassigning Ford, a male Level 7 clerk (Doc. 24-1 at 4–5), to a different reporting location during the abolishment period. Doc. 24-6 at 2; Doc. 24-3 at 12–13; Doc. 24-4 at 3, 12–13; 24-1 at 16. Dellinger could not remember suggesting that USPS should reassign any other clerk to a different location. Doc. 24-4 at 8. And, during the abolishment period, USPS did not reassign any female employees (female employees at Level 6 or otherwise) to a different reporting location. Doc. 24-4 at 15.

19

In addition, the record shows that Dellinger oversaw overtime in the Gadsden cluster.   Doc. 24-3 at 4; Doc. 24-4 at 8.   Dellinger testified that she did not remember if Ford worked much overtime (Doc. 24-4 at 9), but—based on her role as a supervisor of overtime—a jury reasonably could infer that Dellinger was aware that Ford regularly worked overtime.   Doc. 24-1 at 5–6.

Importantly, USPS's decision to reassign Ford to the East Gadsden Post Office deprived Ford of the ability to earn his usual (*pre*-abolishment) overtime pay at the Gadsden Post Office main office.   Doc. 24-1 at 28–29; Doc. 24-3 at 14, Doc. 24-4 at 11.   While the parties dispute whether Ford could have worked overtime in his new assignment to the East Gadsden Post Office (Doc. 24-1 at 11; Doc. 24-4 at 10–11; Doc. 24-4 at 16), the court must resolve that conflict in Ford's favor at the summary judgment stage.   A jury reasonably could find that Ford could not work overtime at the East Gadsden Post Office.   And Ford could not work overtime at the Glencoe Post Office either.   Doc. 24-1 at 11; Doc. 24-4 at 13.

In addition, while Ford's reassignment deprived him of the opportunity to work overtime at the Gadsden Post Office, female clerk employees remained eligible to work overtime at the main office.   Doc. 24-1 at 12–13, 28–29.   In fact, Ford's reassignment made more voluntary overtime available to the female clerks assigned to the main office because overtime was equalized among the clerks.   Doc. 24-4 at 5–7. Before the abolishment, Ford had worked substantial voluntary overtime at

the main office, and Priest—the other male employee whom USPS reassigned during the abolishment period[6]—typically did not work any overtime.  Doc. 24-1 at 12; Doc. 24-4 at 16.  Ford's reassignment away from the main office (Doc. 24-1 at 5–6), combined with Priest's reassignment to the main office (Doc. 24-1 at 12; Doc. 24-4 at 16), meant that more voluntary overtime work was made available to the female clerks in the main office.

In short, Dellinger (a female supervisor) suggested reassigning Ford (a male employee), as part of USPS's decision-making related to the abolishment of clerk positions in the Gadsden cluster; and a jury reasonably could find that Ford's reassignment deprived Ford of his ability to earn overtime at the main office, while at the same time benefitting female clerk employees whom Dellinger supervised.

USPS's decision to reassign Ford also violated multiple rules established in the applicable collective bargaining agreement, including a provision that required USPS to timely post the abolishment positions for employee bidding.[7]  *See* Doc.

---

[6] At oral argument, Ford's counsel argued that USPS's decision to reassign Priest was not evidence of sex discrimination, and that the analysis of the facts would be the same even if Priest had been female.  Consequently, the court focuses on Dellinger's supervisory role, Dellinger's part in Ford's reassignment, the impact that reassignment had on Ford's ability to earn overtime pay, and the increased availability of voluntary overtime work for female clerks at the main office during the abolishment period.  Aside from this note, the court does not address the fact that USPS reassigned only male employees during the abolishment period.

[7] Ford's reassignment also violated the settlement grievance that established the principal assignment to the Glencoe Post Office, under which the LSSA assigned to the Glencoe Post Office would begin each day at the Gadsden Post Office main

28-2 at 138–167; Doc. 24-12 at 17–19; Doc. 24-3 at 4–5, 8.   Without more, the violation of a collective bargaining agreement does not show pretext for discrimination.   *Jolibois v. Florida Int'l Univ. Bd. of Trs.*, 654 F. App'x 461, 464 (11th Cir. 2016).   But, on the record facts here, a jury reasonably could infer that the violation shows that discrimination was part of USPS's decision to reassign Ford during the abolishment period.

That is particularly true because USPS's failure to post the positions for bidding not only violated the applicable collective bargaining agreement (Doc. 28-2 at 138–167; Doc. 24-12 at 17–19; Doc. 24-3 at 4–5, 8), but also effectively prevented Ford from bidding on a position at the Gadsden Post Office main office that would have allowed him to continue to accrue overtime pay while still earning the same salary (Doc. 24-1 at 21; Doc. 24-12 at 15–18; Doc. 28-2 at 138–167; Doc. 24-3 at 15).   The record shows that, if such a position had been posted for bidding, Ford likely would have obtained that assignment—based on his seniority.   Doc. 24-3 at 15.

Dellinger testified that she knew USPS was required to post the positions for bidding, but that she never spoke to anyone about it.   Doc. 24-4 at 17.   Drawing a reasonable inference in Ford's favor, a jury could find that USPS's failure to post the abolishment positions allowed the female clerks to earn overtime pay in the main

office.   Doc. 24-10.

office, prevented Ford from obtaining a position in the main office, and consequently prevented Ford from working the overtime that was available at that location (as he typically had done *pre*-abolishment).   Furthermore, a jury reasonably could infer that Dellinger did not raise the job-posting requirement because she sought to make more overtime pay available to the female clerks in the main office (to Ford's detriment).

### B.   Under the *Babb* standard, Defendant Postmaster DeJoy cannot show that he is entitled to judgment as a matter of law.

At this time, a plaintiff's burden under the *Babb* standard appears light—at least with respect to *liability*.   Under that *Babb* standard, Defendant Postmaster DeJoy cannot show that he is entitled to judgment as a matter of law.   Postmaster DeJoy argues that Ford cannot show discrimination because Dellinger suggested— and USPS decided—to reassign Ford for efficiency reasons.   *See* Doc. 24-4 at 8– 10; Doc. 25 at 23–26.   The argument that USPS reassigned Ford based on legitimate nondiscriminatory efficiency reasons just might carry the day under the *McDonnell Douglas* framework.   *See Lewis v. City of Union City, Ga.*, 918 F.3d 1213, 1220– 21 (11th Cir. 2019) (en banc) (stating the *McDonnell Douglas* framework, which ultimately requires a plaintiff to show that an employer's legitimate nondiscriminatory reason for an action was pretext for discrimination).[8]   But that

---

[8] Under the *McDonnell Douglas* framework, Ford would have to show not only pretext, but also similarly situated comparators.   *See Lewis*, 918 F.3d at 1218

framework only applies on the issue of *relief*.   *See Durr*, 843 F. App'x at 247; *Babb*, 140 S. Ct. at 1177–78.   Under the new *Babb* test, USPS's nondiscriminatory reason is not sufficient for the court to grant summary judgment on *liability*.

As the Eleventh Circuit has instructed, "even when there are non-pretextual reasons for an adverse employment decision," the "presence of those reasons doesn't cancel out the presence, and the taint, of discriminatory considerations."   *See Babb II*, 992 F.3d at 1204.   Thus, for purposes of liability under *Babb*, the fact that USPS articulated a nondiscriminatory efficiency reason for Dellinger's suggestion to reassign Ford cannot "cancel out" the circumstantial evidence based on which a jury reasonably could infer that sex discrimination was part of Dellinger's suggestion— and USPS's decision—to reassign Ford.   *See id.*

Likewise, the fact that USPS personnel other than Dellinger also were involved in the decision to reassign Ford (Doc. 24-6 at 2) cannot "cancel out" that circumstantial evidence.   *See Babb II*, 992 F.3d at 1204.   Again, Dellinger initially suggested reassigning Ford (Doc. 24-4 at 3, 12–13; Doc. 24-3 at 12–13; 24-1 at 16), and then USPS reassigned Ford consistent with her suggestion (Doc. 24-1 at 11). In short (and construing all facts and reasonable inferences in Ford's favor), Dellinger's suggestion played a part in Ford's reassignment.   Because Dellinger's

---

(stating that, under the *McDonnell Douglas* framework, comparators must be similarly situated in all material respects).

suggestion played a part in Ford's reassignment and a jury reasonably could infer that sex discrimination played a part in that suggestion, Postmaster DeJoy cannot show at summary judgment that sex discrimination did not play "any part" in Ford's reassignment.   *See Babb*, 140 S. Ct. at 1174.

\* \* \*

At this stage, the court must construe all facts and draw all reasonable inferences in Ford's favor (*see Centurion Air Cargo*, 420 F.3d at 1149), and the court cannot make credibility determinations (*Anderson*, 477 U.S. at 255).   On the record facts, and under the *Babb* standard for liability, there is just enough evidence for a jury reasonably to infer that sex discrimination was part of Dellinger's suggestion to reassign Ford, which was part of USPS's ultimate decision to make that reassignment during the abolishment period at the Gadsden cluster.   Because there is a triable issue of fact on the question whether Ford's reassignment was "free from any discrimination" (42 U.S.C. § 2000e-16(a)), the court cannot grant summary judgment to Postmaster DeJoy.

## III.   Whether Plaintiff Ford can make the showing necessary to obtain full *relief* remains an open question.

Defendant Postmaster DeJoy has not moved for summary judgment on the question of what relief might be appropriate in this case.   *See Moton v. Cowart*, 631 F.3d 1337, 1343 (11th Cir. 2011) (holding that the district court erred in *sua sponte* granting summary judgment on the issue of damages without first giving notice to

the parties that it intended to address that issue).   While there is a triable issue on the *liability* question, the separate issue of whether Plaintiff Ford can make the showing necessary to obtain full *relief* remains an open question.

As explained above, to obtain full relief, a plaintiff must show that discrimination was the but-for cause of the ultimate employment decision.   *Babb*, 140 S. Ct. at 1171.   Because full relief requires a showing of but-for causation, the *McDonnell Douglas* frameworks and the "convincing mosaic" test still apply in determining whether circumstantial evidence is sufficient to support a finding that a plaintiff is entitled to full relief under § 2000e-16(a).   *See Durr*, 843 F. App'x at 247; *Babb*, 140 S. Ct. at 1177–78.

The question of relief is not yet ripe.   But, based on the record facts, it would appear difficult—under either standard—for Ford to show that sex discrimination was the but-for cause of his reassignment.   *See supra* Part II.B.

## CONCLUSION

For the reasons stated above, there is a triable issue of fact—at least with respect to *liability*—and Defendant Postmaster DeJoy's motion for summary judgment (Doc. 25) is **DENIED**.   Whether Plaintiff Ford can make the showing required for full *relief* remains an open question.

By separate order, the court will set this case for a status conference.

**DONE** and **ORDERED** this December 27, 2021.

_____

**NICHOLAS A. DANELLA**
UNITED STATES MAGISTRATE JUDGE